UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

Roberta L. Wilson,                          Civ. No. 12-1223 (DWF/LIB)

      Plaintiff,


v.                                          **REPORT AND RECOMMENDATION**


Carolyn W. Colvin,

      Acting Commissioner of Social Security,[1]

          Defendant.

---

      Plaintiff Roberta L. Wilson ("Wilson") seeks judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits (DIB) and supplemental security income (SSI). The matter was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. This Court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties submitted motions for summary judgment. [Doc. Nos. 8, 11]. For the reasons set forth below, the Court recommends that Plaintiff's motion for summary judgment [Doc. No. 8] be denied, and Defendant's motion for summary judgment [Doc. No. 11] be granted.

---

[1] Carolyn W. Colvin is substituted as the defendant. She became Acting Commissioner of the Social Security Administration on February 14, 2013.
http://www.ssa.gov/newsletter/

# BACKGROUND

## I.    Procedural History

Plaintiff filed applications for DIB and SSI in March 2009, alleging that she became disabled on July 31, 2005. (Tr. 171-77.)[2] Her applications were denied initially on August 17, 2009, and upon reconsideration on October 20, 2009. (Tr. 104-08, 117-22.) Plaintiff requested a hearing before an administrative law judge ("ALJ"), and a hearing was held before ALJ Roger Thomas on December 13, 2010. (Tr. 123-24, 38-88.) The ALJ denied Plaintiff's claim on January 21, 2011. (Tr. 11-37.) Plaintiff filed a request for review with the Appeals Council, and the Appeals Council denied review on May 8, 2012, (Tr. 9-10, 1-5), thereby making the ALJ's decision the final decision of the Commissioner for the purpose of judicial review. See Grissom v. Barnhart, 416 F.3d 834, 836-37 (8th Cir. 2005).

## II.   Medical Records

On June 19, 2006, at Min No Aya Win Clinic, Wilson was treated for anxiety. (Tr. 334.) When she followed up on July 10, 2006, she was feeling much better on Paxil. (Tr. 341.) On examination, her affect was depressed but she was not anxious. (Id.)

Wilson underwent a diagnostic assessment to determine eligibility for a housing program on April 3, 2007. (Tr. 390-93.) She had recently stopped using alcohol and gone back on medication for anxiety and depression. (Id.) She had no regular income but worked eight hours per week at a sales agency, was signed up with Labor Ready, and had applied for several other positions. (Id.) When depressed, she felt more inclined to use chemicals. (Tr. 391.) Wilson grew up on the Red Lake Indian

---

[2] Throughout this Report and Recommendation, the Court refers to the administrative record, Docket No. 7, as "Tr."

Reservation and attended school through age fifteen, and later earned her GED. (Id.) She reported being sexually assaulted as a child. (Id.) She was later physically abused by her boyfriends. (Id.) She also grieved the loss of her brother. (Id.) Wilson had four children and lost parental rights to her youngest child in 2001. (Id.) Wilson's last of three DWIs occurred in March 2006. (Id.) She had served time in jail for probation violations and alcohol related incidents. (Id.) She last completed chemical dependency inpatient treatment in August 2006, for alcohol, marijuana and opioids. (Id.) She had been through at least nine treatment programs. (Id.) Social Worker Carol Johnson diagnosed mild major depressive disorder, generalized anxiety disorder, and assessed a GAF score of 55.[3] (Tr. 392.) On April 10, 2007, Wilson was taken to the emergency room after calling her daughter and telling her that she tried to commit suicide by taking Paxil, trazadone and drinking beer. (Tr. 695-96.) In the hospital, Wilson's blood alcohol level was notably elevated. (Tr. 699.) The next morning, she said she did not remember taking pills or wanting to kill herself. (Id.) She was discharged home. (Id.)

On April 19, 2007, Wilson was seen in an emergency room at St. Mary's Medical Center in Duluth for hyperventilation. (Tr. 703-04.) She had not been taking Paxil as prescribed. (Id.) She was treated with Ativan and told to restart Paxil. (Id.) Dr. Gary Foley opined there might be a component of alcohol withdrawal. (Id.)

---

[3] The Global Assessment of Functioning Scale ("GAF"), a scale of 0 to 100, is used by clinicians to subjectively rate the social, occupational, and psychological functioning of adults. *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-tr*") 32 (American Psychiatric Association 4th ed. text revision 2000). Scores of 51 to 60 indicated moderate symptoms or moderate difficulty in social, occupational or school functioning. Id. at 34.

Plaintiff saw Dr. David Jorde at CAIR Clinic for depression and anxiety on June 12, 2007. (Tr. 358-59.) Dr. Jorde discontinued hydroxyzine and prescribed clonidine. (Id.) On October 9, 2007, Wilson saw Dr. Jorde and complained of increased anxiety after starting school to become an administrative assistant. (Tr. 363.) On mental status examination, Wilson was not anxious but Dr. Jorde increased her dose of clonidine. (Tr. 364.)

On December 6, 2007, Shaina Connolley of the HDC Homeless Project met Wilson in a jail to assist with housing and mental health concerns. (Tr. 407.) Plaintiff had just started taking her mental health medications in jail the previous day. (Id.) She was in jail for violating her probation by drinking. (Tr. 409.)

Wilson saw Dr. Jorde for increasing general anxiety on February 5, 2008. (Tr. 367-68.) She was taking classes to become an administrative assistant, and her concentration was okay in school but more difficult at home. (Id.) Her sleep was poor, and she felt mildly depressed. (Id.) On examination, her affect was normal, and she did not appear anxious. (Tr. 368.) Dr. Jorde discontinued Paxil and prescribed Celexa. (Id.)

Wilson saw Dr. Jorde for anxiety again on March 11, 2008. (Tr. 374.) Anxiety kept her up at night, she had poor energy during the day, and her concentration "could be better." (Id.) She had to drop two classes. (Id.) She appeared anxious, and her mental status examination was otherwise normal. (Tr. 375.) Dr. Jorde increased her Celexa. (Id.) The following week, Wilson saw Dr. Jorde after being assaulted by her boyfriend. (Tr. 376.) She was still drinking occasionally, and she had not yet started her increased dose of Celexa. (Tr. 377.)

On May 13, 2008, Dr. Jorde noted Wilson was homeless again and had dropped out of school. (Tr. 379-81.) Wilson was now sober for about two months. (Tr. 380.) A few weeks later, she saw Dr. Jorde for worsening anxiety. (Tr. 445.) She did not think her medications were helping. (Id.) On mental status examination, she had her baseline flat affect, and she did not appear anxious. (Tr. 446.) She also had a normal attention span and concentration. (Id.) Dr. Jorde discontinued clonidine and prescribed Wellbutrin and hydroxyzine. (Id.) Dr. Jorde thought she might improve once she had stable housing. (Id.)

In July 2008, Wilson was staying with a friend because she felt unsafe with her abusive boyfriend in her apartment. (Tr. 491.) Several days earlier, she had been intoxicated and fell and hit her head. (Id.) Wilson asked for an increase in her anxiety medication. (Tr. 451.) Dr. Jorde continued her Celexa and hydroxyzine. (Tr. 452.) The next month, Wilson had a tremor in her hands and felt irritable. (Tr. 454.) She had not yet started her increased dose of Celexa. (Tr. 454-55.) She felt social anxiety in crowds, and she was not depressed. (Id.) She was getting out with friends despite her anxiety. (Tr. 454.)

On September 8, 2008, Wilson had a consultative psychological examination with Dr. Marlin Trulsen at the request of the SSA. (Tr. 425-31.) Wilson took a bus to the examination, and she was appropriately dressed and groomed. (Tr. 425.) For the last three months, she lived alone in an apartment. (Tr. 426.) She completed seventh grade. (Id.) In 1985, she got her GED. (Id.) Her last reported employment was doing maintenance at a casino two years earlier. (Id.) The job lasted one month until she was arrested and then let go from her job. (Id.)

Wilson reported to Dr. Trulsen that she had PTSD from a March 2008 assault. (Id.) Her fear of the upcoming sentencing of her assailant made her feel worse. (Id.) She felt afraid at bus stops. (Id.) She was easily irritated and angered. (Id.) Wilson was depressed and anxious since she was a child but the assault made it worse. (Id.) She also believed that she had borderline personality disorder because she always thought people were mad at her. (Id.) Wilson was not taking her Celexa because she did not like how it made her feel. (Tr. 427.) She was drinking a liter of alcohol once a month. (*Id.*) She smoked marijuana once a week. (Id.) She was on probation for DWI. (Id.) Her income was minimal general assistance and food stamps. (Id.) Wilson's interests were watching television, movies, taking walks, going outside, and spending time on a computer. (Id.) On a typical day, she woke up at 6:30 a.m., watched television and cleaned. (Id.) She either went to appointments or took a walk, getting back at noon to eat. (Tr. 427-28.) She went out in the afternoon to walk or ride the bus, and returned at 6:00 p.m. to watch television, eat and clean up. (Tr. 428.) Until midnight, she watched television or talked on the phone. (Id.) She did her own cleaning, shopping, dishes, cooking and laundry. (Id.)

Dr. Trulsen noted Wilson cooperated and tried to do her best in the interview. (Id.) She was alert, oriented and appeared to be in a pleasant mood. (Id.) Her affect was flat but her perceptions seemed appropriate. (Id.) Her judgment and insight were somewhat below age level. (Id.) She denied suicidal or homicidal thoughts, and hallucinations. (Id.) Her speech was normal and stream of consciousness appropriate. (Id.) She endorsed depressed mood, anhedonia, hopelessness, discomfort in large groups of people, and re-experiencing her assault. (Id.) She was unable to count serial

7s backward.  (Tr. 429.)  She remembered one of three objects after five minutes and thirty minutes.  (Id.)  Her memory was adequate for independent daily living skills including riding the bus.  (Id.)  Her IQ was estimated in the average to low average range.  (Id.)

Dr. Trulsen diagnosed PTSD, anxiety disorder not otherwise specified, dysthymic disorder, polysubstance dependence, borderline personality disorder by history, and assessed Wilson with a GAF score of 55-65.[4]  (Tr. 430.)  He opined that Wilson appeared capable of carrying out work-like tasks with reasonable persistence or pace, responding appropriately to brief and superficial contact with coworkers and supervisors, tolerating stress and pressure typically found in entry level work, and respecting authority to an average level.  (Tr. 430-31.)

The day after the foregoing consultative examination, Wilson called Dr. Jorde and reported ongoing anxiety that was worse when she was around people, particularly on the bus.  (Tr. 457.)  Dr. Jorde prescribed propanolol.  (Id.)  On September 16, 2008, Wilson said she was much improved with the propranolol.  (Tr. 460.)  On examination by Dr. Jorde, she had no unusual anxiety or evidence of depression.   (Tr. 461.)

On November 4, 2008, Wilson admitted that she stopped taking Celexa two months ago because it made her sleepy during the day, and her anxiety had increased. (Tr. 465.)  On mental status examination, Wilson was alert and oriented, her affect was normal, she was not anxious, and she denied hallucinations, hopelessness, memory loss, and mood swings.  (Tr. 466.)  Dr. John Nukelich, in consultation with Dr. Jorde, started Wilson on Effexor and discontinued Wellbutrin.  (Id.)  Dr. Jorde completed a

---

[4] GAF scores of 61 to 70 indicate some mild symptoms or some difficulty in social, occupational or school functioning, but generally functioning pretty well.  *DSM-IV-tr* 32.

Medical Opinion form for Wilson's SMRT[5] application on December 17, 2008. (Tr. 543.) He opined that Wilson was unable to work in the foreseeable future based on her depression, anxiety, hepatitis C, history of chemical dependency, and chronic back pain. (Id.) Notably, however, he was unsure if her condition would still be disabling if she were to stop her addictive behavior. (Id.)

On January 13, 2009, Wilson told Dr. Jorde she had been sexually assaulted but had not reported the assault. (Tr. 472.) She was more depressed recently with daytime fatigue, mildly poor concentration, and social withdrawal. (Id.) Propanolol was working well for her occasional anxiety. (Id.) She was taking a medical terminology course. (Id.) Her mental status examination was normal. (Tr. 473.) Dr. Jorde prescribed Wellbutrin. (Id.)

One month later, Wilson was in Beltrami jail and depressed because her daughter died recently in childbirth. (Tr. 477.) Dr. Jorde wanted to be sure she was getting her prescriptions for Effexor and Wellbutrin. (Id.) She was released from jail on March 17, 2009. (Tr. 478.) A physician assistant, on behalf of Dr. Jorde, completed a Medical Opinion form for Wilson that day, opining she was disabled by depression, anxiety, hepatitis C, history of chemical dependency and back pain, which would remain disabling if she stopped her addictive behavior. (Tr. 542.)[6]

Wilson saw Dr. Lorraine Turner on March 24, 2009, for increased depression and anxiety after her daughter died the previous month. (Tr. 479.) Wilson had self-

---

[5] SMRT stands for State Medical Review Team, and it is a unit of the Department of Human Services in Minnesota that determines disability.
http://hcopub.dhs.state.mn.us/12_10.htm

[6] This was the first time that Dr. Jorde, or anyone completing forms on his behalf, indicated that Plaintiff would continue to be disabled even if she stopped addictive behaviors.

increased her propranolol, and she was given Ativan in jail. (Id.) Wilson denied alcohol or drug use. (Id.) On mental status examination, she was anxious and depressed but otherwise normal. (Tr. 480.) Dr. Turner increased Wilson's Effexor. (Tr. 481.) Dr. Turner also completed a Medical Opinion form for Wilson, opining she was disabled by anxiety, depression, back pain, hepatitis C, and that her chemical dependency was in remission. (Tr. 541.) Notably, however, she did not express an opinion whether Wilson would be disabled if she stopped abusing substances. (Id.)

The same day, Wilson had a consultation to establish care at Superior Health Center. (Tr. 565-67.) Wilson was not anxious, she was fully oriented and had a normal affect. (Tr. 566.) Nurse Jessica Morgan diagnosed major depressive affective disorder, generalized anxiety disorder and PTSD. (Tr. 566-67.) She referred Wilson to Teresa Carr. (Tr. 566.) On April 2, 2009, Wilson underwent an initial psychiatric evaluation at Superior Health Center. (Tr. 497.) She was diagnosed with major depressive affective disorder and PTSD, with a GAF score of 55. (Tr. 498-99.) In May 2009, Wilson was approved for ARMHS[7] services. (Tr. 496.)

Wilson was evaluated by Social Worker Melanie Olson at Well-Being Counseling and Services Center. (Tr. 571.) On April 22, 2009, Wilson was sober and wanted to get custody of her grandson. (Tr. 572.) Her longest previous period of sobriety had been almost one year, and she was then presently sober since March 13, 2009. (Tr. 573.) On mental status examination, she was healthy appearing but her mood was depressed, and Olson checked boxes on a form to describe Wilson as negative/gloomy,

_____

[7] Adult Rehabilitative Mental Health Services.
http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&
RevisionSelectionMethod=LatestReleased&dDocName=id_004956

angry/hostile and anxious/tense. (Tr. 574.) Wilson's speech was clear. (Id.) She had suicidal thoughts earlier that month. (Tr. 575.) Her judgment was fair, and she was fully oriented. (Id.) Her cognition was distracted, inattentive, scattered, impaired by anxiety, with impaired short-term memory. (Id.) Her motor activity was unremarkable. (Id.) Olson assessed Wilson with a GAF score of 60. (Tr. 576.)

Wilson's first therapy with Social Worker Olson was on April 28, 2009, and Wilson appeared very tired, and her affect was sad and anxious. (Tr. 599.) The next day, Wilson saw Clinical Nurse Specialist Teresa Carr for depression. (Tr. 652.) With exception of depressed and anxious mood, Wilson's mental status examination was normal. (Tr. 652-53.) Nurse Carr discontinued Effexor and prescribed Cymbalta. (Tr. 653.) Wilson did not remain sober before her next session with Social Worker Olson on May 6, 2009. (Tr. 598.) On June 24, 2009, Nurse Carr noted Wilson was not compliant with her medications. (Tr. 656.) Wilson had discontinued Cymbalta and was not using propranolol as prescribed. (Tr. 657.) Carr prescribed Wellbutrin, and increased it in July 2009. (Tr. 557, 659.) Carr assessed Wilson with a GAF score of 55 on July 22, 2009. (Tr. 662.) Wilson's depression, anxiety and sobriety were up and down through the end of November. (Tr. 580-97, 763-68.)

Wilson underwent a consultative psychological examination with Dr. Marcus Desmonde on August 6, 2009, at the request of the SSA. (Tr. 535-37.) Wilson reported that her last alcohol use was the previous weekend, and she said she could only stay away from alcohol when in jail. (Tr. 535.) Her depression increased when her 27-year-old daughter died. (Id.) Wellbutrin helped her wake up in the morning, and propranolol helped her relax. (Id.) She did not take her medications if she knew she was going to

drink alcohol.  (Id.)  Wilson was kept awake at night by noisy neighbors and often went back sleep until noon.  (Tr. 536.)  In the afternoon, she watched television.  (Id.)  Her boyfriend came by for supper and stayed until midnight.  (Id.)  She did not have many other friends because her boyfriend was jealous.  (Id.)  Wilson walked or rode a bus to get around.  (Id.)  She self-medicated her depression with alcohol.  (Id.)  Wellbutrin was helpful when she was not drinking.  (Id.)  Without medicine, she had trouble sleeping, low energy, hopelessness, crying spells and isolation.  (Id.)  Propanolol helped her sleep at night when she was stressed.  (Id.)

On mental status examination by Dr. Desmonde, Wilson was oriented with low average to borderline concentration.  (Id.)  She could add serial sevens slowly, and her memory was adequate.  (Id.)  Her judgment and insight were significantly impaired due to alcohol use.  (Id.)  Her estimated IQ was 85, plus or minus 5.  (Tr. 537.)  She exhibited some dependent personality features.  (Id.)

Dr. Desmonde diagnosed alcohol dependence, mood disorder secondary to alcohol dependence, adjustment disorder with mixed anxiety and depression, and he assessed Wilson with a GAF score of 50-60 in the last six months.  (Id.)  He opined that Wilson was capable of understanding simple instructions and carrying out tasks "only within limitations set by a treating or evaluating physician."  (Id.)  He felt she would be able to interact briefly with coworkers, supervisors and the general public.  (Id.)  If she continued her alcohol dependence, she would have difficulty tolerating the stress and pressure of competitive employment.  (Id.)

On August 13, 2009, Dr. Dan Larson reviewed Wilson's social security disability file and opined, in a Psychiatric Review Technique Form, that she suffered affective,

anxiety and substance use disorders that caused mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in concentration, persistence or pace. (Tr. 505-18.) Based primarily on the consultative psychological examinations, in a Mental Residual Functional Capacity Assessment form, Dr. Larson opined Wilson could concentrate on, understand, remember and carry out routine, repetitive, 3-4 step, limited-detail tasks with adequate persistence and pace, and handle brief and superficial contact with coworkers and the public, cope with reasonably supportive supervisory styles, and handle the stress and pressure of the above described work. (Tr. 519-21.)

Social Worker Melanie Olson completed a Medical Opinion form for Wilson on September 1, 2009. (Tr. 540.) She opined Wilson would continue to be disabled by depression and anxiety if she stopped her addictive behavior. (Id.) On September 9, 2009, Nurse Carr added sertraline (Zoloft) to Wilson's medications to help with her mood. (Tr. 664.) Wilson's mood improved, and Carr assessed a GAF score of 60 on September 24, 2009. (Tr. 665-66.)

After reportedly being sober for 40 days, Wilson drank again on September 30, 2009. (Tr. 671.) She continued to get drunk and was arrested twice for disorderly conduct. (Id.) She did not drink everyday but when she drank she binged until she passed out. (Tr. 671.) Two weeks later, Wilson was not compliant with her medications, and rated her depression three out of ten, and her anxiety four out of ten. (Tr. 668-70.) Her attention was mildly distracted, but her mental status examination was otherwise normal. (Tr. 669.) On October 20, 2009, Social Worker Olson noted that Wilson's depression and anxiety had improved. (Tr. 764.)

Wilson completed a Rule 25 Assessment for chemical dependency treatment on November 9, 2009. (Tr. 630-46.) She reported that she drank alcohol once a week until she blacked out, and then had four-day hangovers. (Tr. 631.) She had recently smoked marijuana daily and used cocaine twice a month. (Id.) Two weeks earlier, she had many withdrawal symptoms. (Tr. 632.) In the past month, she had symptoms of depression and anxiety. (Tr. 634.) She had attempted suicide three times, the last time in 2009 by trying to hang herself in jail due to grief. (Id.) Wilson reported the following problems in her daily life: headaches, relationship problems, difficulty problem solving, difficulty concentrating and remembering, fights or arrests, and difficulty reading, writing and calculating. (Tr. 635.)

In therapy with Social Worker Melanie Olson from December 2009 through February 2010, Wilson's sobriety, depression and anxiety were stable, her affect was sad and often anxious, but her thought process was "clear." (Tr. 769-75.) Nurse Carr assessed Wilson with a GAF score of 60 on December 31, 2009, when Wilson's mood was anxious, but her mental status examination was otherwise normal. (Tr. 678-79.) The same was true on January 28, 2010. (Tr. 680-82.)

Against staff advice, Wilson discharged herself from the Tagwii Outpatient Treatment Program on February 16, 2010. (Tr. 795.) During treatment, Wilson maintained sobriety until mid-January 2010, when she relapsed on crack cocaine. (Tr. 796.) Wilson was recommended for inpatient treatment. (Id.) Her GAF score at that time was 35. (Tr. 795.) She was admitted to Pioneer Recovery Center on February 19, 2010. (Tr. 844.) Wilson again left Pioneer without staff approval and was officially discharged on March 31, 2010. (Tr. 844-45.)

Wilson followed up with Nurse Carr on April 15, 2010, and reported a stable mood, and she had remained sober since leaving treatment.  (Tr. 683-85.)  Her mental status examination was normal with the exception of mild, situational anxiety.  (Tr. 684.)  Wilson was certified by SMRT as disabled from July 1, 2010 through July 1, 2012.  (Tr. 648.)  On September 29, 2010, Nurse Carr assessed Wilson with a GAF score of 60.  (Tr. 692-93.)  Wilson's mood was anxious and depressed, but her mental status examination was otherwise normal.  (Id.)  Carr recommended discontinuing sertraline and starting Prozac.  (Tr. 693.)  On October 13, 2010, Wilson's boyfriend was causing her anxiety.  (Tr. 826-27.)  Later that month, Carr noted Wilson was living in a shelter and found it hard to leave due to anxiety.  (Tr. 829-30.)  Notably, Nurse Carr wrote, "don't see her depression and anxiety as being as much of a primary issue as it was."  (Tr. 831.)

Wilson saw Nurse Jessica Morgan on November 2, 2010, for abdominal and back pain, fluctuating moods and hot flashes.  (Tr. 833-36.)  Wilson last drank alcohol in October.  (Tr. 834.)  One month later, Wilson's mood was fairly stable.  (Tr. 837-39.)  Her mental status examination was normal with the exception of anxious mood.  (Tr. 838.)

On December 9, 2010, Nurse Carr provided a disability opinion letter regarding Wilson.  (Tr. 842.)  The letter observed that Wilson worked hard to attain her present level of mental health stability.  (Id.)  She was taking her medications as prescribed.  (Id.)  Even so, Nurse Carr believed Wilson's anxiety and depression, which increased under stress or around people or crowds, would make it impossible to maintain gainful employment.  (Id.)  Leaving her apartment was enough to create significant anxiety for

Wilson.  (Id.)  If Wilson was not drinking, Nurse Carr thought she might be able to make it to work three out of five days per week, and not at all if she was drinking.  (Id.)

On January 28, 2010, Nurse Carr opined Wilson was doing well overall, but she was considering inpatient CD treatment.  (Tr. 680-82.)  On May 10, 2010, Wilson told Nurse Morgan she was doing well overall in terms of her depression.  (Tr. 686-90.)  Her last drink of alcohol was one week ago.  (Tr. 687.)  She had a flat affect but was oriented and not anxious.  (Tr. 689.)

The following medical evidence was also submitted to the Appeals Council. Wilson underwent a diagnostic assessment at Nystrom & Associates on December 14, 2010.  (Tr. 853-59).  Wilson was living alone and did not see her children often.  (Tr. 855.)  Her mental status examination was positive for depressed mood, sleep disturbance and appetite disturbance.  (Tr. 856.)  Her energy level was low but she denied anxiety symptoms.  (Tr. 857.)  Psychologist Marshall Fightlin assessed Wilson with a GAF score of 51-60.  (Tr. 859.)  He next saw Wilson for depression on December 22, 2010.  (Tr. 860.)  Wilson said she was forgetful and sometimes could not get out of bed.  (Id.)  She was oriented with depressed mood and flat affect.  (Id.)  Wilson underwent a mental health assessment with Nurse Angela Woelpern for ARMHS eligibility on May 3, 2011.  (Tr. 848-51.)  Wilson often felt tired and moody.  (Tr. 848.)  She had now been living in the same apartment for three years but wanted something nicer.  (Id.)  Wilson was attending and enjoying communication and anger management groups.  (Id.)  Wilson had been sober for one month.  (Tr. 849.)  On mental status examination, her concentration was scattered, her mood was pessimistic and

depressed, but otherwise normal.  (Tr. 850.)  Nurse Woelpern assessed a GAF score of 51.  (Tr. 851.)

## III.    Administrative Hearing

On December 13, 2010, Wilson testified as follows at a hearing before ALJ Roger Thomas.  (Tr. 38-88).  She was 5'1" tall and weighed 151 pounds.  (Tr. 47).  She was never married but had four children.  (Id.)   She had been living alone for three years.  (Tr. 48.)  She had a boyfriend whom she saw every day.  (Id.)  In 2006, Wilson lost her driver's license due to DWI.  (Tr. 49.)  She used buses to get around.  (Id.)  When she was anxious, she felt hyper and could not sit still.  (Tr. 60.)  She had anxiety attacks when she had to leave the house, which sometimes caused her to miss appointments.  (Tr. 61.)  Seeing people made her anxious.  (Id.)  She spent most of her time alone in her apartment.  (Id.)  Her rage and anger improved since her chemical dependency treatment.  (Tr. 62.)

Wilson had a GED and tried to go to vocational school but could not keep up.  (Tr. 50.)  She had difficulty concentrating, especially understanding what she read.  (Tr. 62-63.)  She also lost interest in things and did not complete tasks.  (Tr. 63.)  Wilson quit Lake Superior College after a few months because she went to jail for a probation violation.  (Tr. 54.)  Her last drink was on November 15th of that year.  (Tr. 51.)  She usually drank with others, not alone.  (Id.)  Wilson was never hospitalized for psychiatric reasons, but she took medications for anxiety and depression that were somewhat helpful.  (Tr. 56.)

In 2005, Wilson had worked as a waitress for seven months. (Tr. 57.) Wilson believed her depression was what prevented her from doing work she had done in the past. (Tr. 69.)

Wilson was able to care for herself, cook, clean and do laundry. (Tr. 58.) Wilson saw an "ARMS" worker, Penny Klitzke, up to twice a week for help with housing applications and finances. (Tr. 64.) The ARMS worker also made sure she took her medications. (Id.) Stress caused Wilson to feel anxious and angry, and then she avoided people. (Tr. 65.) Certain people, including her boyfriend, caused her stress. (Tr. 65-66.) Twice a week, she cried or stayed in bed. (Tr. 66.) She spent most of her time in bed because she had nothing else to do. (Id.) Depression caused her to stay home alone for four or five days in a row. (Tr. 67.) She had trouble sleeping at night and then slept during the day. (Id.)

Wilson's ARMS worker, Penny Klitzke, testified at the hearing. (Tr. 71-77.) Klitzke started working with Wilson in April 2010, and saw her once or twice a week. (Tr. 71.) Klitzke assisted Wilson in working with a financial worker and social worker. (Tr. 72.) Klitzke usually met Wilson at a coffee shop. (Id.) Wilson cancelled appointments due to back pain and anxiety. (Tr. 73.) Family deaths recently increased Wilson's depression and isolation. (Id.) When her depression and anxiety were high, Wilson could not concentrate on workbooks, and this occurred at three out of four appointments. (Tr. 74.) When Wilson was depressed, she stayed in bed and did not bathe or clean her house. (Id.) Stress caused Wilson to shut down. (Id.) Klitzke did not think Wilson could hold a full-time job because she suffered back pain and

depression that caused her to stay in bed. (Tr. 76.) Wilson could only have one productive meeting with Klitzke per week. (Tr. 77.)

Dr. Michael Lace, a psychologist, testified at the hearing on behalf of Plaintiff as a medical expert. (Tr. 77-82.) Wilson told Dr. Lace she had slips with her sobriety approximately monthly in late 2008 and 2009. (Tr. 78-79.) When using alcohol, she would end up getting in a fight or taking her anger out on someone. (Tr. 79.) Dr. Lace believed Wilson had moderate restrictions in activities of daily living, marked difficulties in social functioning, and marked difficulties in concentration, persistence or pace, but no episodes of decompensation. (Tr 81.) His restrictions would remain the same if substance abuse was not a factor, based on the record and his experience with substance use disorders. (Id.) Therefore, Dr. Lace's opinion was that Wilson met listing 12.04 and substance abuse was not material to disability. (Id.) Dr. Lace noted his opinion was supported by other medical opinions in the record and by Exhibit 35F [Nurse Teresa Carr's opinion letter, Tr. 842]. (Tr. 81-82.)

Jesse Ogren testified as a vocational expert. (Tr. 82-85.) The ALJ posed a hypothetical vocational question concerning a 41 to 46-year-old person with a GED, past work set out in the VE's report,[8] and impairments of low back pain, left hip pain, hepatitis C, left sacroiliac pain, alcohol dependence, past marijuana, cocaine and opioid use, anxiety with GAF scores of 55 and 60 in the last few years, and personality disorders. (Tr. 83-84.) The ALJ asked the VE to assume the hypothetical person was limited to light exertional work, and work with simple instructions and brief interactions with others. (Id.) Ogren testified such a person could not perform Wilson's past

_____

[8] Wilson's past relevant work was reported as being a security guard. (Tr. 296.) Plaintiff does not dispute this representation as to her past relevant work.

relevant work as a security guard because it was semi-skilled. (Tr. 84.) However, Ogren testified such a person could perform other jobs such as stuffer,[9] polisher,[10] and garment bagger.[11] (Tr. 84-85.)

Wilson's counsel asked VE Ogren to assume the hypothetical person had the problems with anxiety and stress described by Nurse Carr in Exhibit 35, and Ogren testified there were no jobs such a person could perform. (Tr. 86.) There would also be no jobs available to a person who would miss work three days per month or if the person could not sustain attention and persistence on tasks up to one third of a workday. (Tr. 86-87.)

## IV.    The ALJ's Decision

In concluding that Plaintiff was not disabled at any time between the alleged onset date and the date of the decision, the ALJ followed the sequential, five-step process set forth in the Code of Federal Regulations and the special regulation regarding cases involving drug or alcohol abuse.    See 20 C.F.R. §§ 404.1520; 404.1535; 416.920.  Under the five-step sequential process, a claimant is disabled only if:  1) he or she is not presently engaged in substantial gainful activity; 2) he or she has a severe impairment that significantly limits his or her ability to perform basic work activities; 3) his or her impairment is presumptively disabling; 4) if his or her impairment is not presumptively disabling, the claimant cannot perform his or her past relevant work; and 5) if the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner to prove that there are other jobs that exist in significant

---

[9] DOT 731.685-014, with 9,000 such jobs in Minnesota.
[10] DOT 709.687-010, with 9,000 such jobs in Minnesota.
[11] DOT 920.687-018, with 3,000 such jobs in Minnesota.

numbers that the claimant can perform. <u>Simmons v. Massanari</u>, 264 F.3d 751, 754-55 (8th Cir. 2001).

If there is medical evidence of a claimant's drug abuse or alcoholism, the ALJ must follow the procedure in 20 C.F.R. § 404.1535. The ALJ must determine whether drug addiction or alcoholism is a contributing factor material to the determination of disability by considering whether the claimant would still be disabled if she stopped using drugs or alcohol. <u>Id.</u> § 404.1535(b)(1). The ALJ must first determine which physical and mental limitations would remain if she stopped using drugs or alcohol, and second, whether those limitations would be disabling. <u>Id.</u> § 404.1535(b)(2). If the remaining limitations were not disabling, drug addiction or alcoholism was a contributing factor material to disability. <u>Id.</u> § 404.1535(b)(2)(i). If the remaining limitations were disabling, the claimant was disabled independent of her drug addiction or alcoholism, and it was not a contributing factor material to disability. <u>Id.</u> § 404.1535(b)(2)(ii).

At the first step of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (Tr. 17.) At the second step, the ALJ found that Plaintiff had severe impairments of chronic back pain, hepatitis C, depression versus dysthymia, PTSD, borderline personality disorder by history, chemical dependency, and anxiety not otherwise specified. (<u>Id.</u>) At step three of the disability evaluation, the ALJ determined Plaintiff met Listings 12.04 (affective disorders), 12.08 (anxiety-related disorders) and 12.09 (substance abuse disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17-18.)

The ALJ proceeded to consider whether Plaintiff's impairments would be disabling if she stopped her substance abuse. The ALJ decided Plaintiff would still have

a severe impairment or combination of severe impairments, but she would not medically meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20.) The ALJ found that Plaintiff would have mild restrictions in activities of daily living, if she stopped abusing substances. (Id.) The ALJ cited Dr. Trulsen's description of his interview with Plaintiff. (Id.) The ALJ also found Plaintiff was capable of managing her household, completing paperwork to obtain housing and going to school during periods of sobriety. (Tr. 21.) The ALJ found Plaintiff would have only moderate difficulties in social functioning if she stopped her substance abuse, based on Dr. Trulsen's statement that she was cooperative and appeared to do her best in the interview. (Id.) Also, the ALJ found no records indicating that Plaintiff had "great difficulty" getting along with treatment providers or being involved with the law due to social altercations during periods of sobriety. (Id.)

The ALJ also concluded Plaintiff would have only moderate difficulties with concentration, persistence or pace if she stopped her substance abuse because her mental status examination with Dr. Trulsen was generally normal with overall IQ in the average to low average range. (Id.) The ALJ also cited "many other unremarkable mental status examinations throughout the applicable time period associated with periods of sobriety." (Id.) Finally, the ALJ found no episodes of decompensation during periods of sobriety because Plaintiff was not hospitalized solely for psychiatric treatment, not enrolled in a day treatment program, and did not receive any increase in outpatient psychotherapy for an extended period during periods of sobriety. (Id.)

At the next step of the evaluation, the ALJ concluded that if Plaintiff stopped her substance abuse, she would have the residual functional capacity needed to perform light work with the following specific limitations:

> [S]he is able to lift up to 20 pounds occasionally and 10 pounds frequently; she is able to sit, stand and/or walk each up to 6 hours in an 8-hour workday; she is further limited to simple instructions and brief interactions with others.

(Tr. 22.)

In determining Plaintiff's RFC, the ALJ found that Plaintiff's statements concerning the severity of her symptoms and limitations were not credible for the following reasons. (Tr. 23-24.) The ALJ stated that Plaintiff's mental status was unremarkable on examinations when she was not using alcohol, citing medical records in October 2006, April 2007, February 2008, June 2008 and an "in-depth" assessment by Dr. Desmonde in April 2009, when she was assessed with a GAF score of 60. (Tr. 25.) The ALJ noted Plaintiff had ongoing therapy with Social Worker Melanie Olson with improved symptoms in July and September 2009. (Id.) The ALJ also cited Plaintiff's normal mental status examinations in April 2010 and from records in late 2010. (Id.)

The ALJ stated that Plaintiff's allegations of disability were not completely credible because she was not compliant with medications throughout the applicable time period, as indicated in medical records of April 2007, June 2009, and October 2009. (Tr. 26.) The ALJ also found Plaintiff's activities were not as limited as one would expect given the severity of her allegations, citing her school attendance in the fall semester of 2006, October 2007, and February 2008. (Tr. 26-27.) The ALJ recognized that Plaintiff dropped out of school and was homeless in May 2008, but she was able to

complete paperwork and secure section 8 housing with minimal assistance by June 2008. (Tr. 27.)

The ALJ found that Plaintiff's criminal history might also be a cause of her unemployment because she lost her job in 2006 after being jailed for DWI. (Id.) She spent time in jail again in February 2008 and early 2009. (Id.) She had three DWIs in her life and had been arrested many times. (Id.) Furthermore, Plaintiff worked after the alleged onset date, indicating that her activities of daily living, at times, were greater than she reported. (Id.) She worked eight hours per week in April 2007, and applied for other positions after losing her job in December 2006. (Id.) Her work history also indicated that she worked only sporadically prior to the disability onset date, which also suggested her unemployment might not be due to medical impairments. (Id.)

The ALJ did not give any probative weight to the opinion of Plaintiff's medical expert, Dr. Lace, that Plaintiff met Listing 12.04 because it was not consistent with the weight of the objective medical evidence. (Tr. 27.) The ALJ gave probative weight to the consultative examiners' opinions. (Id.) The ALJ rejected Nurse Teresa Carr's opinion as conclusory and lacking specific work-related limitations. (Tr. 28.) The ALJ also noted he could not give her opinion great weight because the issue of disability was reserved to the Commissioner. (Id.) Finally, the ALJ noted Nurse Carr's records of Plaintiff's mental status examinations throughout the applicable time period were unremarkable and inconsistent with Carr's opinion. (Id.)

The ALJ gave Dr. Trulsen's opinion "some probative weight" because he had the opportunity to actually examine Plaintiff, and his opinion was generally consistent with his examination notes, he was a specialist in clinical psychology, and familiar with the

disability regulations.  (Id.)  The ALJ also found his opinion to be consistent "with the weight of the objective mental status examinations throughout the applicable time period."  (Id.)  Next, the ALJ gave Dr. Desmonde's opinion "great probative weight" because he was familiar with the disability regulations, his assessment was generally consistent with his own notes and the weight of the objective medical findings.  (Id.)

The ALJ did not give Dr. Jorde's opinions great weight because he did not assign any specific work-related restrictions, and the issue of disability is reserved to the Commissioner.  (Id.)  The ALJ also could not credit a March 2009 opinion limiting Plaintiff to twenty hours work per week because there was no indication of where it originated, and there were no medical findings supporting it.  (Id.)  The ALJ also gave no probative weight to ARMS worker, Ms. Klitzke's, opinion because she was not a qualified medical professional capable of rendering an opinion on Plaintiff's work-related limitations, and because the issue of disability is reserved to the Commissioner.  (Id.)

The ALJ found that if Plaintiff stopped the substance abuse, she would not be able to perform her past relevant work as a security guard, based on the VE's testimony.  (Tr. 29.)  The ALJ found, however, that if Plaintiff stopped the substance abuse, she would be able to perform occupations such as stuffer, polisher, and garment bagger, of which there were thousands of jobs in the economy of the State of Minnesota, according to the VE.  (Tr. 30.)  Thus, the ALJ concluded Plaintiff's substance abuse was a contributing factor material to disability, and she had not been disabled within the meaning of the Social Security Act from the alleged onset date through the date of the decision.  (Id.)

**DISCUSSION**

## I.  STANDARD OF REVIEW

Disability, as defined by the Social Security Act, is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To be eligible for benefits, an individual's impairments must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy".  42 U.S.C. § 423(d)(2)(A).  It is the claimant's burden to prove entitlement to disability benefits under the Social Security Act.  20 C.F.R. § 404.1512(a).  Once the claimant demonstrates that he or she cannot perform past relevant work due to disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do."  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).

Judicial review of the Commissioner's decision to deny disability benefits is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole.  Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005).  Substantial evidence means more than a scintilla but less than a preponderance.  Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009).  Substantial evidence exists if "a reasonable mind would find it adequate to support the ALJ's decision."  Id. (quoting

Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).  The substantial evidence test requires "more than a mere search of the record for evidence supporting the [Commissioner's] findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (alterations in original) (quoting Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987)).  Rather, the court "must take into account whatever in the record fairly detracts from its weight."  Id.  (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).  The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence.  Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).

## II.    Analysis

There is no dispute that Wilson is disabled when her substance abuse is considered together with her other physical and mental impairments.  The issue is whether drug abuse or alcoholism is a contributing factor material to disability, a determination that is made by considering what impairments and limitations would remain if Wilson stopped using drugs and alcohol.  Wilson asserts the ALJ should have credited the testimony of her proferred Medical Expert Dr. Lace that she met Listing 12.04 for affective disorders, even if she stopped her substance abuse.  (Pl's Mem. in Supp. of Mot. for Summ. J. ("Pl's Mem.") 27-29.)  Wilson contends Dr. Lace's opinion is consistent with opinions of her treating sources, citing medical opinions from December 2008, March and September 2009, the SMRT July 2010 finding of disability, Nurse Carr's December 2010 opinion, and ARMS worker Klitzke's testimony.  (Pl's Mem. 29-

30, 32-33.)  Furthermore, she asserts the ALJ should have obtained more information from Dr. Lace, if he needed clarification of the basis for his opinion.  (Pl's Mem. 31-32.)

Wilson argues the ALJ erred by relying on the opinions of two state agency examining consultants, Dr. Trulsen and Dr. Desmonde, who each saw Wilson only once.  (Pl's Mem. 33.)

Wilson points out that Dr. Trulsen did not review most of the records the ALJ had before him.  (Pl's Mem. 34.)  Additionally Trulsen's reasoning for his mental RFC opinion was based in part on Wilson's ability to ride the bus, but evidence in the record showed Wilson sometimes could not leave her house, and riding the bus caused anxiety.  (Id.)  Finally, Wilson notes her condition worsened after her daughter died in February 2009, and Dr. Trulsen's exam was before that.  (Id.)

Wilson asserts the ALJ erred by giving Dr. Desmonde's opinion great weight because Dr. Desmonde's diagnoses did not match the severe mental impairments the ALJ found were supported by the record.  (Pl's Mem. 34-35.)  Wilson asserts Drs. Trulsen's and Desmonde's opinions were based on an incomplete record; therefore, they lacked foundation.  (Id.)  Dr. Lace's opinion, however, was based on the entire record and the testimony at the hearing.  (Id.)  Furthermore, Wilson asserts the ALJ did not actually adopt Dr. Trulsen's or Desmonde's opinion but made his own inferences from the record.  (Pl's Mem. 36.)  Finally, Wilson contends it was inappropriate for the ALJ to give some weight to the nonexamining state agency consultant's opinion.  (Id.)

First, in response, the Commissioner contends the ALJ's decision demonstrates that Wilson's impairments were not disabling when she was drug and alcohol free, citing the ALJ's analysis of the paragraph B criteria of the Listings, and evidence that her

objective mental status examinations were inconsistent with disability.  (Def's Mem. 10-13.)

Second, the Commissioner asserts the ALJ did not err by granting great weight to Drs. Trulsen's and Desmonde's opinions.  (Def's Mem. 13-20.)  The ALJ's decision was supported by his finding that Wilson's psychiatric medications controlled her symptoms when she was not using drugs or alcohol.  (Def's Mem. 15.)  Her GAF scores of 55-60 also supported the ALJ's conclusion that her symptoms were only moderate when she was abstaining.  (Def's Mem. 15-16.)  Her ability to attend school and look for work after her disability onset date was inconsistent with disability.  (Def's Mem. 16.)  And, her mental exams were relatively normal when she was abstaining.  (Id.)  Wilson's daily activities were also inconsistent with disability.  (Id.)  This evidence corroborated Drs. Trulsen's and Desmonde's opinions.  (Id.)

The Commissioner contends the record does not support Wilson's argument that her condition deteriorated after she saw Drs. Trulsen and Desmonde because even thereafter the medical records show that she was given GAF scores of 55-60, was doing well overall, had normal mental status examinations, and showed improvement.  (Def's Mem. 19.)  And, the ALJ's findings were not unsupported conclusions, they were supported by the opinions of two consultative examiners, a nonexamining state agency consultant, conservative course of treatment, unremarkable mental exams, and improvement with medication.  (Id.)

All of the above arguments can be analyzed within the framework of the regulations on opinion evidence.

In making an RFC determination, the ALJ must evaluate every medical source opinion. 20 C.F.R. § 404.1527(c). The ALJ should give a treating source's RFC opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009). "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain . . . the weight given to the opinions of a State agency medical or psychological consultant." 20 C.F.R. § 404.1527(e)(2)(ii); Willcockson, 540 F.3d 878, 880 (8th Cir. 2008). The factors used in weighing medical opinions are 1) length of treatment relationship; 2) nature and extent of treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record as a whole; 5) specialization of the physician; and 6) any other factor brought to the ALJ's attention. 20 C.F.R. § 404.1527(c).

The distinction between "acceptable medical sources" and other health care providers who are not acceptable medical sources is important here insofar as only "acceptable medical sources" can be considered treating sources whose opinions may be entitled to controlling weight. Social Security Ruling ("SSR") 06-3p, 71 FR 45593-03, *45594 (Aug. 9, 2006). Acceptable medical sources include licensed physicians and licensed psychologists. 20 C.F.R. § 404.1513(a). Of Wilson's health care providers, only Dr. Jorde and Dr. Turner qualify as acceptable treating medical sources. While they are not treating sources, Drs. Lace, Trulsen, Desmonde, and Larson are acceptable medical sources.

Other sources, whose opinions may be used to show the severity of a claimant's impairment and how it affects her ability to work, include medical sources that are not acceptable medical sources, such as nurse practitioners, physician assistants, chiropractors, therapists; and public and private social welfare agency personnel. 20 C.F.R. § 404.1513(d). Walsh, Carr, Olson, and Klitzke fall under this latter category.[12]

In weighing medical opinions, if a treating source's opinion is not given controlling weight, examining source opinions are generally given more weight than nonexamining sources. 20 C.F.R. § 404.1527(c)(1). When treating source opinions are not given controlling weight, the following factors are used to weigh all medical opinions: length of treatment relationship and frequency of examination; nature and extent of treatment relationship; supportability of the opinion, particularly based on medical signs and laboratory findings; consistency of the opinion with the record as a whole; specialization of the source; and other factors brought to the SSA's attention. Id. § 404.1527(c)(2)(1-6).

Two of the above factors outweigh the other factors in this case, consistency of the opinions with the record as a whole and supportability of the opinions. It is true that Carr, Olson, Klitzke and Turner[13] had more significant relationships with Wilson than the

---

[12] Opinions from other than acceptable medical sources, including non-medical sources, should be weighed under the factors in 20 C.F.R. § 404.1527(c), to the extent applicable. SSR 06-3p at *45595-96. The ALJ must explain the weight given to acceptable medical sources opinions and "generally should explain the weight" given to opinions from other sources. Id. at *45596.

[13] It isn't clear whether Walsh saw Wilson more than once. Although he completed a disability form for Wilson on behalf of Dr. Jorde, Wilson does not assert Dr. Jorde's opinion should be given more weight. Indeed, on a Medical Opinion form Dr. Jorde completed for Wilson in December 2008, he did not respond to the question whether Wilson would remain disabled if she stopped her addictive behavior. (Tr. 543.) Dr.

30

consulting examiners and nonexaminers, but their opinions are not consistent with the evidence in the record as a whole, not supported by their own treatment records (or that of the prior case worker, in Klitzke's case), and not supported by substantial evidence that Wilson would still be disabled if she stopped abusing drugs and alcohol.  On the other hand, the record as a whole supports Drs. Trulsen's and Desmonde's opinions because Wilson's mental impairments were only mild to moderate when sober, with the exception of the few months after her daughter's death when Wilson's depression was understandably more severe.

The record as a whole indicates Wilson had longstanding chemical dependence, and during the relevant time period she had only short periods of sobriety, primarily when she was in jail after abusing alcohol or in treatment for chemical dependency.  In fact, in August 2009, Wilson told Dr. Desmonde she last used alcohol one week ago, and she only stayed away from alcohol when in jail.  (Tr. 535.)  Wilson was in chemical dependence treatment in August 2006, using in April 2007, in jail for violating probation by drinking in December 2007; twice in 2008, she reported getting drunk monthly; and she was drinking off and on from April to May 2009 and July through November 2009. In a Rule 25 assessment in November 2009, Wilson admitted drinking once a week to the point of black-out, recently smoking marijuana daily, and using cocaine twice a month.  (Tr. 631.)  She used cocaine again in January 2010, and alcohol in May and October 2010.  (Tr. 796, 687, 834.)  In April 2007, when she called her daughter saying she had attempted suicide by taking pills, her blood alcohol level was significantly

Turner likewise left this question blank on a Medical Opinion form she completed for Wilson in March 2009.  (Tr. 541.)

elevated, and the next day she did not remember taking pills or wanting to kill herself, and she was discharged home. (Tr. 695-96.)

The record as a whole demonstrates on a recurring basis, that as she recovered from a period of intoxication, her depression, anxiety and ability to function improved, as evidenced by mostly normal mental status examinations, GAF scores representing only moderate limitations in functioning, and attempts to work or go to school. For example, Wilson admittedly lost her last full-time job when she went to jail in 2006, but thereafter, in April 2007, she worked part-time in sales and looked for other work, she went to school in October 2007 and February 2008, and took a medical terminology course in January 2009. (Tr. 27, 425, 391, 363, 367, 472.) She admitted quitting Lake Superior College after a few months because she again went to jail. (Tr. 54.)

Wilson was assessed with the following GAF scores, indicating only moderate limitations in functioning: 55 in April 2007; 55-65 from Dr. Trulsen; 55 and 60 in April 2009; 55 from Nurse Carr in July 2009; 50-60 from Dr. Desmonde; 60 from Nurse Carr in September 2009; 60 in December 2010; and 51-60 in supplemental records submitted to the Appeals Council. See Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010) (history of GAF scores between 52 and 60, taken as a whole, indicated the claimant had moderate symptoms or moderate difficulty in occupational functioning.) Throughout the record, Wilson's mental status examinations were largely normal when she was sober, with some depression and anxiety noted, but very few instances of severe symptoms or any effect on her cognitive functioning.

Additionally, although Wilson reported much difficulty getting along with others, more so when she was drinking, the many providers who treated her did not record

observing socially inappropriate behaviors. Wilson alleged severe anxiety outside her home, particularly riding a bus, but she very rarely mentioned this to her treating providers. (Tr. 454, 457.) Furthermore, although she told Dr. Trulsen about her anxiety around people and especially on the bus, she also conversely told him that she spent her typical day walking outside and riding the bus. (Tr. 426-28.)

One reason Wilson may have improved in periods of sobriety, as noted by the ALJ, was that Wilson often quit taking her psychiatric medications when she was abusing substances, and regularly reported that her medications helped when she resumed taking them. (Tr. 341, anxiety much better on Paxil; Tr. 390, 392, recently back on medication; Tr. 705-06, not taking Paxil as prescribed; Tr. 375-77, 454-55, had not started increased dose of Celexa as prescribed; Tr. 42, not taking Celexa; Tr. 457, 460-61, 472, anxiety much improved on propranolol; Tr. 465, anxiety worse when she stopped taking Celexa; Tr. 656-57, not compliant with meds; Tr. 535, Wellbutrin and propanolol help but does not take meds if she will be drinking; Tr. 666, mood improved on sertraline.) See Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (noncompliance with medication is a valid reason for discrediting a claimant's subjective complaints); *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (an impairment that can be controlled by medication cannot be considered disabling.)

Wilson contends the ALJ did not adopt Drs. Trulsen's or Desmonde's opinions but improperly drew his own inferences from the record. Although the ALJ did not explicitly adopt Dr. Trulsen's or Dr. Desmonde's opinion, the ALJ's RFC finding was consistent with their opinions; Dr. Trulsen limited Wilson to work with "simple instructions;" and Dr. Desmonde limited Wilson to entry level work; both limited Wilson

to brief contact with others.  The ALJ's mental RFC determination limited Wilson to work with simple instructions and brief interactions with others.[14]

As Wilson points out, Drs. Trulsen and Desmonde did not have the benefit of all of the evidence the ALJ had before him.  Therefore, it was proper for the ALJ to take the additional evidence of record into account in determining Wilson's residual functional capacity.  See Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (affirming ALJ who relied on reviewing physician's opinion together with other medical evidence in the record in arriving at RFC determination); 20 C.F.R. § 404.1527(c)(3) ("[w]e will evaluate the degree to which [nonexamining] opinions consider all of the pertinent evidence in your claim"); 20 C.F.R. § 404.1527(b) ("we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive"); 20 C.F.R. § 404.1545(a)(1) ("[w]e will assess your residual functional capacity based on all the relevant evidence in your case record.")

Wilson contends the ALJ gave inadequate reasons for rejecting ARMS worker Penny Klitzke's opinion.  The specific reasons the ALJ gave for rejecting Klitzke's opinion, that she was not a qualified medical professional and that disability is an issue reserved to the Commissioner, were not very illuminating.  However, any error was harmless because Klitzke's opinion, like the other opinions the ALJ rejected, was inconsistent with the evidence in the medical record as a whole, especially Wilson's GAF scores, mental status examinations, increase in symptoms when noncompliant with medications, and decrease in symptoms when compliant with medications.

---

[14] Dr. Desmonde also limited Wilson to carrying out tasks "only within limitations set by a treating or evaluating physician," but this could reasonably be interpreted to apply to Wilson's physical abilities, which she alleged were limited by pain.  (Tr. 537.)  Wilson does not dispute the ALJ's physical RFC finding.

Certainly Wilson has many psychosocial factors contributing to depression and anxiety, and one could easily believe a person with her problems might be severely depressed and anxious, but there is substantial evidence in the record supporting the ALJ's determination that substance abuse was a contributing factor material to disability. "If . . . the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." <u>Goff v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005). For these reasons, this Court recommends that the Commissioner's motion for summary judgment be granted.

## VI.   CONCLUSION

Based on the foregoing and all of the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.   Plaintiff's Motion for Summary Judgment [Docket No. 8] be DENIED;

2.   Defendant's Motion for Summary Judgment [Docket No. 11] be GRANTED;

3.   If this Report and Recommendation is adopted, that Judgment be entered accordingly.

Dated:  August 2, 2013

/s/ Leo I. Brisbois_____
LEO I. BRISBOIS
United States Magistrate Judge

## NOTICE

Pursuant to Local Rule 72.2, any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 16, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections

within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.